# NEW JERSEY ZINC CO. v. SINGMASTER et al.

District Court, S. D. New York.
March 27, 1933.

Supplemental Opinion, April 11, 1933.

Wing, Lakin, Russell & Whedon, of New York City (Frederick J. Moses, of New York City, of counsel), for plaintiff.

Herman Goldman, of New York City (Elkan Turk, of New York City, of counsel), for defendant Singmaster.

Cadwalader, Wickersham & Taft, of New York City (William Lloyd Kitchel and John F. Neary, both of New York City, of counsel), for defendant Tubize Chatillon Corporation.

CAFFEY, District Judge.

In a case, such as this, that involves consideration or ascertainment of intention or mental state or condition, difficulty is almost always-experienced. Here also there are dif-

ficult questions of law. In this case we reach a point where the law governing patents and the law governing contracts come into contact. In order fairly to consider or determine the questions of law, therefore, it is essential very carefully to discriminate with which branch of the law we are concerned. As counsel have indicated in their briefs, the subject involved is one upon which there has been much controversy. Certainly in some of the lower court decisions there has been a good deal of confusion. That confusion, as I see it, particularly from my reading of the Supreme Court decisions, has been principally attributable to the failure to realize within what field the issue for determination lay.

In the present trial there has been a good deal of conflicting testimony. That is familiar experience of a trial judge. It brings but the ordinary work of the day. A consequence, however, is that, in endeavoring to arrive at the truth, it is requisite to consider questions of credibility, of weight of testimony, of bias, and what not. In arriving at what is deemed to be established by the testimony, it is not essential always to go further than to consider the type of witness, his demeanor, his bias, and the other ordinary incidentals. This is so in determining in a law court, precisely as in the everyday affairs of life, the weight to be assigned to what a particular person says. It is not essential often in my experience to conclude that there has been conscious falsification by a witness. At any rate, in so far as practicable for a judge, he being as human as anybody else, it is desirable to avoid attributing bad intent to a witness who has taken the stand and there under oath made his statement. We may have recourse also to the probabilities of a situation in ascertaining the truth.

I am glad to say that in the present trial I find no occasion, in order to determine or to make an effort to determine where the truth is, to indulge in any harsh comment upon any witness.

The proof has taken a wide range. Much of it has become wholly immaterial. Omitting mere conclusions on the part of witnesses, I think that when, combined with the documents, we take into account the testimony which is either undisputed or so plainly correct that it must be accepted, we can apply the law and reach a determination as to what is the duty of the court. In other words, when we disregard conclusions and disregard testimony which manifestly should be disregarded because erroneous, the truth is clear without having to say that any witness has intentionally sworn to an untruth.

The findings which I shall make will be based on the entire proof, and there is no part of it that I have not considered in reaching the views that I shall announce. Nevertheless, my comment, in proportion to the volume of the proof, will be fairly brief. I shall indicate only the important features of the case upon which I chiefly rely in reaching my conclusions.

I shall take up the patents separately. I shall deal first with the so-called first American patent, No. 1,725,742. The application for that patent was filed by Mr. Singmaster on September 28, 1927. It was granted to him on August 20, 1929. It is entitled, "Artificial Silk-Filament and Method of Making Same." ·

As to this patent there have been raised, and there have been discussed by counsel, seven principal questions. These are:

(1) Was there a contract between the plaintiff, on the one hand, and the defendant Singmaster, on the other, as to the ownership of patentable ideas?

(2) If so, was the subject of litigation on this branch of the case comprehended within that contract?

(3) If both of those questions be answered in the affirmative, is the contract the basis of a decree for specific performance?

(4) Was there abandonment by the plaintiff of what was involved in the work of Mr. Singmaster, whatever it may have been, in November, 1926?

(5) Was the defendant corporation a bona fide purchaser for value from Mr. Singmaster of what it acquired by the contract of March 5, 1930, or by the assignment delivered in escrow preceding that date covering this patent?

(6) Has the plaintiff been guilty of laches that bars a recovery?

(7) Is the plaintiff estopped from maintaining this suit?

· I shall take up the questions in the order stated and discuss each of them.

Whether or not there was a contract hinges around instructions 4–B. That was adopted in October, 1921, and was in force until 1929. In consequence, it was in existence as between the plaintiff and the defendant Singmaster, in event it is determined to be a contract, at the time of the occurrence of the events with which we are concerned in this trial.

It is plain that the plaintiff assented to those instructions. Did Singmaster assent? That is the issue upon this branch of the case. It is clear also that, in the event there was assent by both parties, there was adequate consideration. We therefore have to inquire whether Singmaster assented, so that, by mutual assent of the two parties, it became a contract equally binding on both of them.

It is without dispute that there had existed since 1912 instructions of the general nature of those embodied in instructions 4–B, adopted in 1921. It is without dispute that all of these were known to Singmaster and that he participated in advance in the consideration, and to some extent in the formulation, of those instructions. It is without dispute that during the fifteen years from 1912 to 1927 he regularly received compensation from the plaintiff. It is without dispute that Singmaster transferred to the plaintiff twenty patents, or applications for patents, fourteen of these preceding the adoption of 4–B and six thereafter. It is also without dispute, and is shown by documents, that Singmaster from time to time took a position as affecting others, who were in the employ of the plaintiff, that they were bound by those instructions as a contract.

Upon these facts, which are either without dispute or so thoroughly established that I feel bound to accept them, I see no escape from the conclusion that Singmaster assented to instructions 4–B, and that they constituted a contract between him and the plaintiff.

There are several arguments presented to the contrary.

First, it is urged that back in 1900, when Mr. Singmaster entered the employment of the plaintiff as a $40 a month man, in the talk he had with Mr. Converse nothing was said about patents, and hence that oral employment exempted him from being bound or affected by instructions 4–B. Even if we gave full force to those facts, the very circumstance that patents were not mentioned at that time is a convincing reason why, when they were taken up and dealt with under the facts as I have recited them, that subject-matter came within the comprehension of what the parties agreed to upon the adoption of the instructions. I reject wholly the contention that either by its terms, or in law, this oral arrangement with Mr. Converse back in 1900 took Mr. Singmaster without the terms of the general instructions as a contract between himself and the plaintiff.

Next, it is said that in or about 1913 there was presented to Mr. Singmaster by Mr. Sinn, as I recall the name, the son-in-law of Mr. Converse, a paper referred to as the employment contract and he refused to sign it. Now, examination of that paper discloses that, even if it had been signed, it would not have taken Mr. Singmaster without the terms of these instructions; but, as Mr. Singmaster himself says, when he refused to sign it, he did it merely for the reason of an apprehension on his part that it might jeopardize his pension record. I reject therefore the contention that in any way this contract, which I have found to exist under 4–B, was at all affected by what occurred back in 1913 with respect to the employment document.

In the third place, it is said that the chart of 1917, or thereabouts, defining the executive duties of Mr. Singmaster, exempted him from 4–B or its predecessor. As I understand, his fourth defense setting up rescission is designed to plead this chart as a basis of exemption from the provision of the instructions. The very fact that on its face the chart, containing a general definition of duties, includes executive duties, or the very further fact that it precedes the date of these instructions, completely nullifies the effect sought to be attributed to it upon the instructions as a contract between the plaintiff and Mr. Singmaster under the facts as I have recited them and have found them to be.

Fourth, it is said that in 1921 there was a discussion in progress as to whether or not it would be advisable for the plaintiff to adopt the device of a special patent contract with each employee or to rely merely upon general instructions. It is said that Mr. Singmaster announced that he would not sign any such paper, or, except under protest, advise any of the other employees to sign it. If so, that is utterly immaterial so far as relates to the question with which we are presently concerned. As matter of fact, the general instructions, which had theretofore prevailed as a system, were continued as a system, and Mr. Singmaster did assent to the general instructions 4–B.

Lastly, it is said, as I understand the argument, that checks were paid and stock privileges or stock turned over to Mr. Singmaster, and that these things would indicate that there was some special treatment of himself, by way of interpretation perhaps, on the part of the plaintiff, of the instructions, so as to indicate that the plaintiff regarded Mr. Singmaster as taken out of the general in-

structions. All that the defendants have indicated as a basis for this contention is that certain of these events with respect to checks and stock occurred on dates not far distant from and subsequent to some specially good work in regard to patents that had been done by Mr. Singmaster. The proof also is, however, that the benefit of such checks and the participation in stock were equally conferred on or about the same dates upon persons in plaintiff's employ who had no connection with patents. Moreover, Mr. Hayes, whose testimony I accept, squarely and unequivocally explains the policy of the company in regard to the distribution of those checks and stock, and they had no relation whatsoever to patents, or rather to patent obligations between Mr. Singmaster and the plaintiff. Doubtless the good work done by Mr. Singmaster with regard to patents, alike as with respect to the performance of his executive duties, was taken into account by the plaintiff in including him among the restricted number of employees to whom these special rewards were granted. The transactions as to checks and stock were wholly without any effect upon the existence or nonexistence of a contract between the plaintiff and Singmaster.

I find complete and unambiguous acquiescence and consent on the part of Singmaster to the general instructions governing him, as it did others, as between himself and the company.

■ The rules and regulations cases to which counsel have referred all turn upon issues of fact. An employer may by general rules or regulations prescribe the terms of a contract with his employees, if the employees consent. The question is always in the cases cited an issue of fact; and here the issue of fact on the proof and on the undisputed proof, as I see it, must be resolved against Mr. Singmaster.

■ Was the subject of the litigation covered by the contract?

This brings us particularly to the consideration of that subdivision of instructions 4–B which deals with the ownership of patents. What does it say? The exact wording is as follows:

"All patentable ideas and devices originating with or developed by an employee of this Company or a subsidiary company, while in the employ of such company, shall belong and shall be formally assigned to The New Jersey Zinc Company by the inventor or inventors."

That especially is the clause of the contract which must here be interpreted—interpreted in the light of its own phraseology, interpreted as a part of the entire instrument in which it is contained, interpreted in the light of the purposes to be accomplished, and interpreted in the light of the circumstances.

■ It is plain to me that this clause applies to all employees of the plaintiff. The obvious purpose was to provide something that should be applicable to them all. Why these instructions, or why general instructions, unless that was to be accomplished? We do not have to go outside of the very terms of the document itself, however. It is manifest on its face. Was Singmaster an employee? Of course he was. It applies therefore to him. There is not a word or a syllable in the instrument that would exempt one who was in the employment of the plaintiff because of his rank in the organization. It is immaterial whether he was at the head of a department or the lowest man in it. If he was an employee, then it governed him, whether he was at the top or at the bottom.

■ It is plain also that this provision was applicable to patentable ideas of all kinds. There is no possible warrant, as I see it, for confining the patentable ideas to something that related directly to the work being carried on by the company, by the employer company. The language would have had to be restricted to have that effect, and here it is in the broadest terms. The language is, "all patentable ideas." So that comprehended those which had no relation whatever to the particular line of business of the company, as well as those which had relation to the particular line of business of the company. We can easily imagine a reason for that. Without that being true, there would have been injected a basis for dispute with regard to a great many matters that might arise; and it is plain on the face of this instrument that it was drawn with care. We need not, however, go beyond the use of the word "all." It covers everything.

So also, and for that reason, whether the matter related to the domestic or foreign patent field, it was included in this instrument.

■ Now, we come to the ideas. The contract says that the ownership shall pass to the employer, if those ideas either originated or were developed during the period of employment. Mr. Singmaster was employed until May 1, 1927. We therefore get into an issue of fact as to dates, which I must take up later; but, if the ideas comprehended within

the ownership section cover the subject-matter of this litigation, and if during the period of Mr. Singmaster's employment the ideas, in the sense of the contract, were either originated or developed, then by the express provision of the clause they became the property of the plaintiff.

That carries us then to an interpretation of the phrase "patentable ideas." Does the determination of that issue keep us within the patent field or carry us into the contract field? As I have heretofore indicated, we are dealing with a somewhat novel question and one where the fields of patent law and of contract law meet. The issue, partly of law and partly of fact, is whether what was comprehended prior to May 1, 1927, was a patentable idea. That involves definition and it involves date. It also involves the very difficult task on the part of the court of endeavoring to ascertain from the proof what was in the mind. The dates are within a rather narrow range. The plaintiff says that the patentable idea came about and came into existence, within the meaning of the contract, prior to May 1, 1927. Mr. Singmaster on this trial has said that it came into existence on May 7, 1927. We have therefore a range of a week in controversy between the parties. That, as I have said, is within a pretty narrow limit of time.

What is a patentable idea? The defendants have argued this case as if the meaning were the same as if the contract had related only to an invention, a completed invention, to which upon presentation of an application to the Patent Office the plaintiff would have been entitled to the issuance of a patent.

The difference of meaning in the patent law between idea and means is well settled; certainly it is, and at the time of the formulation of instructions 4–B was, well known to lawyers. This document bears all the earmarks of having had at least the scrutiny of lawyers. We may fairly assume that it was not put into final form until, as was indicated by the testimony, it had been gone over with great care by lawyers.

The patent statute (35 USCA § 31) relates to arts, manufactures, machines, and compositions of matter. None of those phrases was used in the document. Invention was not used in the document. The word is "ideas." It cannot therefore be confined in its meaning to arts or to machines or to manufactures or to compositions of matter. It cannot therefore be confined to inventions. Doing either would nullify the language employed. It says "ideas," and the obligation imposed upon an employee was to transfer his ideas to the employer. Ideas is the subject-matter of property rights. Ideas may be the subject of property rights and of obligation to transfer from one person to another. Why, therefore, should there be a restriction from the normal meaning of the word "ideas"? I find no justification for it in the language employed.

It is argued that the combination with ideas of the word "patentable" has the effect urged by the defendants. "Patentable" is there employed as an adjective. It undoubtedly is entitled to the full force of its meaning. What is its office here? Certain it is that the instruction related to patents. Certain it is that it was not the object of the contract to vest in the employer property in ideas of all character that might exist on the part of its employees. A field or class had to be defined as between the two.

It is difficult with precision to put into words just the extent to which the employment of this adjective carried the parties. I think the intention was to classify the ideas, so that they should be of a nature novel or inventive in their relations, and rationally associated with what would be a proper basis of presentation in an application to the Patent Office. The machinery provided in the contract for the handling of patentable ideas strongly indicates that this was the office or significance of the adjective.

Can it be that, before there came into existence an obligation under the contract on the part of an employee to transfer to the employer, it must appear that, in event the matter had been presented to the Patent Office, it would grant a patent on it? Can that be the meaning? Plainly not. That would attribute to the parties, in the use of language, as it seems to me, little less than an absurdity. Nobody in advance could tell whether in the performance of its duty the Patent Office would or would not grant a patent on an application. History and common experience alike demonstrate that it is frequently, we might without much exaggeration say practically universally, the experience that it is a struggle to get a patent out of the Patent Office. Every application receives, as we all know, the most careful scrutiny and study. What it describes is the subject of comparison with the entire art as it exists at the time. It is also the subject of interferences. What is asked for is a monopoly of what is included within the application. It is necessary, in order to accomplish the reason for its existence, that the Patent Office go through this procedure. A restriction of the phrase "pat-

entable idea" in such a way that, before it can be interpreted to confer the right of property or an obligation to transfer, it must appear that what is included in the expression constitutes so complete an invention that, if it were handed over to the Patent Office for consideration, thereupon a patent would issue, cannot be warranted. That is not the meaning. Yet that would be the meaning if the interpretation insisted on by the defendants were adopted. As I conceive it, it has no greater significance here than its employment as a classification of the type of ideas dealt with in the ownership clause of instructions 4–B.

I have found no governing precedents in the court decisions I have examined. The reason for that is clear. This matter turns upon contract law and not upon patent law. The question is, What does the contract mean? If we ascertain that, then the rights of the parties as between each other are not within the realm of rational dispute.

Reduction to practice is not necessary to constitute a patentable idea. Otherwise there would be a contradiction in terms. So also the tests of invention, as they are employed by the courts in infringement cases and in priority cases, do not govern this case. They do not control us in ascertaining the meaning of the contract as between these parties. Of course, in those infringement and priority litigations, rights between individuals were involved; but, when it comes to the issuance of patents, one to whom the government makes an award gets a monopoly. The public is interested. Here we are only concerned with rights between two individuals, an employer and an employee. If I be correct in the views I have stated, then the error, as I conceive it, in the argument advanced by the defendants is in their premise. They have failed to distinguish between the class of questions where the public is involved or in regard to the priority of a patent or the validity of a patent or the infringement of a patent and the like, and a question where the rights between two individuals under a contract is the determining issue. That line between the type of questions is well pointed out, on a somewhat different subject, in the case of International News Service v. Associated Press, 248 U. S. 215, 39 S. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293. That I think you can take as the analogy governing this case and governing the duty of the trial court in the selection of the avenue by which it must approach the determination of this case.

As I have previously indicated, we are entitled to interpret this document in the light of its purposes as disclosed by its recitals or the language it employs. We are entitled also to take into account the surrounding circumstances. I find no occasion to resort to surrounding circumstances because, as it seems to me, the meaning of the phrase "patentable ideas" is clear from an analysis of the language; but, if we consider the purpose disclosed by the instrument itself, it but fortifies the conclusion I have reached. When we add to that the surrounding circumstances, it further fortifies that conclusion.

This employer was establishing or had established, at considerable expense, buildings and equipment. It was organizing a force for research. Undoubtedly its primary purpose was, and it was a proper purpose, to ascertain things that might increase or affect the distribution of its own products. It sought out and selected people of talent, such as Mr. Singmaster; everybody accords to him great talent. If the company were going to spend the money and incur the expense, it would have been foolish on its part not to take to itself the advantages; whether generous or not, certainly it was reasonable, and there was nothing harsh about it. An employee could leave at will. If an employee was not satisfied with working under the conditions prescribed, he need not enter the employment or he could leave when he got ready. But, so long as he was there, an obligation on his part to transfer to the company the benefit of the work he did, and for which he was paid, was not unreasonable.

Now, we must turn to the facts, and see whether or not what is comprehended within this litigation comes within the terms of the contract.

I shall consider the question first as if the law, or rather as if the meaning of the contract, were not as favorable to the company as I have indicated I think it is. I shall consider it as if the subject-matter of the litigation comprehended within the contract—that is, the ideas which the employee was obligated by the contract to transfer to the employer—must have gone to the extent of invention, and certainly of invention without reduction to practice; in other words, that there must have been conception which included identified means for the accomplishment of the purpose of the novel idea.

If that be taken to be the measure of the rights as between the parties, then I find that Mr. Singmaster has made an explicit admis-

sion in writing that the matter had reached that point while he was still in the employ of the plaintiff.

The patent was issued on August 20, 1929. An interference by Dreyfus and Platt was declared on October 21, 1930. Mr. Chambers sent the declaration of interference, including a precise copy of its two counts, to Mr. Singmaster. What were the counts in that declaration of interference? If you read them, you will see that they are substantially a repetition of the fourth and fifth claims of the already issued patent.

Now, consider the circumstances: Mr. Singmaster was called upon to respond to a charge of anticipation by some one else of the identical thing with which we are concerned in this litigation. What are those counts? The first was this:

"An artificial silk filament having its opacity and covering power increased by having submerged in and widely distributed throughout its mass a small percentage of small particles of pigment-like inorganic material the quantity and distribution of the particles being such as not to materially impair the continuity of the mass of the filament."

The second count was this:

"An artificial silk filament having the characteristics of claim 4 in which the pigment-like particles distributed in the mass of the filament are of materials inert to the action of chemicals used in the manufacture dyeing and bleaching of the filament."

Mr. Singmaster had that document about sixteen days. He had the advice of skilled counsel, both in Philadelphia and in New York, in the preparation of his response. He had also, as we shall see later on, the advantage of conference with the president of the Tubize Silk Company, in advance of the preparation of his reply. What does he say in reply? In his statement of November 7, 1930, he says, in response to these two counts which I have quoted, "that he conceived the invention set forth in the declaration of interference on or about the first day of July, 1926." There is no qualification to that. He was dealing there with the patent after it had issued, after it had been out of the Patent Office for some fourteen or fifteen months. Here is something that he framed into language after conferring with the president of the Tubize Silk Company, which had previously accepted ownership of the patent from him or transfer from him. He was advised by counsel, and he deliberately said, as to this identical thing, that the identical thing which is described in the two counts which I have recited was conceived on or about July 1, 1926, a good many months before he left the employment of the plaintiff on May 1, 1927.

Mr. Singmaster goes on to say "that he made no drawing of the invention." Then he next says "that he first disclosed the invention to others in the month of September, 1926, and to the best of his knowledge and belief before the 10th day of September in said year," also well within the employment period. Then he adds "that the first written description of the invention was made on November 6, 1926," also well within the period of employment. He goes on to say that he made "a further disclosure to others" on the 7th of May, 1927, referring, of course, to his interview on that day with Mr. Coursen, then the president of the Tubize Silk Company. He says again that "a second and more amply written description of the invention was made by him on the 10th day of May, 1927." The reference there is to the memorandum of May 10, 1927, Defendants' Exhibit 35, on which I will comment later.

As I have said, reduction to practice is not necessary in order to constitute a patentable idea under contract law. We are not concerned therefore with the recital in this preliminary statement "that the first reduction to practice of the invention was on the 9th day of June, 1927," referring there, of course, to the Hopewell tests by Mr. Coursen in the Tubize Silk Company's plant.

Mr. Sage and Mr. Arnold of the Pennie-Davis firm were told by Mr. Singmaster concerning this matter in August or September, 1926. The reference to the date September 10, 1926, in the preliminary statement answering the interference proceeding, is to the interview with Mr. Sage; and the proof shows that there was a conference in regard to the matter with both Mr. Arnold and Mr. Sage as early as August or September, 1926. The proof also shows that during the sixteen days' pendency of the preparation of a reply to the declaration of interference on October 21, 1930, there was at least one interview with Mr. Sage, and that this interview occurred on November 3, 1930. The proof indicates that there were other conferences with Mr. Sage; but certainly there was the one of November 3. The proof is further that there was an interview with Mr. Chambers, the patent counsel for the Tubize Silk Company in Philadelphia, as early as May 31, 1927, and there is included among the exhibits the correspondence between Mr. Singmaster and Mr.

Chambers from October 22 to November 7, 1930—quite a period—in regard to the preparation of this identical paper.

Mr. Sage was not called; Mr. Arnold was not called; Mr. Chambers was not called. Why? The ordinary reason for not calling an available witness is because, if you do call him, he will testify to something adverse to what you claim. The present situation is worse than that. Mr. Sage was here on the stand, called by the other side as a witness to some records. Not a question was propounded to him having relation to what had been disclosed to him in September, 1926, or in November, 1930. Mr. Arnold was not called at all. Mr. Chambers was not called at all.

The corporate defendant likewise must bear the brunt of the inevitable inference of failure to call those witnesses. Mr. Sage became the counsel of the corporate defendant in regard to this matter as early as July, 1929. Mr. Chambers was the counsel of the corporate defendant as early certainly as May, 1927, and throughout the whole proceedings. Yet it did not call either Mr. Sage or Mr. Chambers.

The Supreme Court has said over and over again that silence is one of the most pregnant evidential facts. I cannot but conclude that the failure on the part of the defendants to call these three witnesses was attributable to the realization on the part of the defendants that, if called, they would not have substantiated Mr. Singmaster's testimony.

Moreover, the evidence shows that Mr. Chambers and Mr. Sage are highly competent and highly reputable lawyers. Yet, with full knowledge of the facts, according to the testimony of Mr. Singmaster, who says he laid everything before them, they recited in the most unequivocal terms in the preliminary statement, dealing, as I have pointed out, with the identical subject-matter covered by the issued patent, including opacity, delustering and all, that the thing which was embraced in the patent was conceived by Mr. Singmaster while in the employ of the plaintiff, was disclosed while in the employ of the plaintiff, and was described while in the employ of the plaintiff.

It is suggested that a preliminary statement is a pleading. Of course it is. But a pleading is also evidence; a pleading in a lawsuit is evidence. It is familiar to put in evidence as an admission a statement made in a pleading by a party to the litigation. This was not only a pleading, but it was a sworn pleading. An unsworn pleading is evidence of an admission; but this was a sworn pleading, and a sworn pleading that had been phrased after the most careful consideration and the most competent advice.

Let us see, however, about the evidence outside of these documents. I think the evidence outside of these documents will show two things: First, a failure on the part of Mr. Singmaster to extricate himself from the admission; and, second, corroboration of the correctness of the admission.

Remember that we are dealing with the problem of penetrating the mind of Mr. Singmaster, and I may say here and now that I am not criticising him. He is a man of great talents. It is perfectly manifest, however, that he is a man of a good deal of feeling. Sometimes we refer to that as being temperamental. Certainly he has strong feeling, and he is interested in the result. He may be somewhat biased or forgetful as to dates. Yet I do not even suggest conscious falsity on his part; not at all; and I do not want anything that I say to be interpreted as a reflection on him. As heretofore suggested, it is merely part of the day's work to try to find where the truth lies when testimony is conflicting. It is an unusual experience—unusual in my experience—to have witnesses of the class who have appeared at this trial go on the stand and take a solemn oath and then consciously lie. I do not accuse Mr. Singmaster of anything like that.

We have a narrow issue here. The question is whether these things we are talking about became patentable ideas prior to May 1, 1927, or, if we are to take the contention of Mr. Singmaster as stated by him, whether they became patentable ideas on May 7, 1927 —a difference of a week. Mr. Singmaster says that between July, 1926, and April, 1927, he put in not exceeding five or six hours on this subject. He says, on the other hand, that in the single interview on May 7 with Mr. Coursen he thereupon made the invention. That is the substance of what he says.

Now, first, let us take up certain documents put in by the defendants themselves as evidence in their own behalf, and see what significance is to be attributed to them on this issue.

On November 3, 1930, Mr. Singmaster made a memorandum, Defendants' Exhibit 56, of his interview with Mr. Sage in regard to the reply to be made to the Dreyfus interference. In it there is not a word or suggestion of a claim by him to have made the in-

vention on May 7, 1927. That is of some significance. Taken in connection with certain other documents, I think it has considerable significance.

Under date of November 6, 1930, Mr. Chambers sent a letter to Mr. Singmaster, Defendants' Exhibit 58, and there for the first time we have a reference to the "first personally written description"; and how does Mr. Chambers, the defendant corporation's lawyer, phrase it? He says, "I have thought it best to include in the statement of your disclosure to Mr. Coursen and your first personally written description." Mr. Chambers plainly knew of the talk between Mr. Singmaster and Mr. Coursen on May 7, 1927. Yet this is not mentioned in Mr. Singmaster's memorandum of his interview with Mr. Sage on November 3, and you will note that the reference of Mr. Chambers is to the May 7 talk as "your disclosure to Mr. Coursen." There is no suggestion by this careful lawyer, Mr. Chambers, of an "invention" on May 7.

Mr. Singmaster sent a reply under date of November 7, 1930, Defendants' Exhibit 59, in which he transmitted the preliminary statement to Mr. Chambers; and what is in it? Is there anything there about the invention having been made on May 7? Not at all. Here is what he says: Having complied with the suggestion that originated with Mr. Chambers, he says, "I note that you have thought it best to include in the statement the date of my disclosure to Mr. Coursen and my personally written description thereof."

That is how the portion of the preliminary statement relating to the "further disclosure to others" on May 7, 1927, originated.

There is another letter from Mr. Singmaster to Mr. Chambers, and it contains two interesting and relevant statements, Defendants' Exhibit 57. This was written on November 5, 1930. That was two days after the interview with Mr. Sage and after the preparation by Mr. Singmaster of the memorandum of that date which I have already referred to. The first statement by Mr. Singmaster in his November 5 letter to Mr. Chambers is this: "This interference proceeding has been the cause of some concern to our Tubize friends and I have had some conversations with Messrs. Slaughter and Scott on the subject and they in turn have had me discuss the matter with our friend Sage of Pennie, Davis, Marvin & Edmonds." Then again, further on in the letter, Mr. Singmaster says: "Now regarding the dates. I conceived the invention of my patent," "conceived the in-

vention of my patent." That surely means when he had already reached the point when he had a "patentable idea"—"I conceived the invention of my patent about July 1, 1926." This is not a lawyer's language, embodied in a statement prepared by lawyers. This is Mr. Singmaster's letter to his lawyer. "I conceived the invention of my patent about July 1, 1926. I disclosed the invention to others early in September, 1926." "I disclosed the invention." That is what Mr. Singmaster said it was. He calls it an "invention." Is that a "patentable idea," within the meaning of this contract? He characterizes both the conception and the disclosure—characterizes them in a lay letter to his lawyer—as an invention. "I disclosed the invention to others early in September, 1926 when I asked Messrs. Sage and Arnold of his office to make a search of the art in this respect. The first written description of the invention I suppose could therefore be considered as the letter written me on November 6, 1926, covering the search by Mr. Sage of the prior art. The invention was first reduced to practice on June 9, 1927." The invention was reduced to practice "on June 9, 1927, when the first spinning of silk containing a pigment was made by Messrs. Coursen and Rudgely at the laboratory of the Tubize Company in Hopewell."

You will note that the May 7 talk with Mr. Coursen is characterized as a "further disclosure," or second disclosure. That implies a precedent disclosure.

So much we derive as to the facts from the exhibits put in at this trial on their own behalf by the defendants. They do not extricate the defendants from the unambiguous admissions made by Mr. Singmaster in the preliminary statement. On the contrary, they strongly tend to corroborate the admissions there made. There are other facts, however.

As I have said, Mr. Singmaster testified that he only gave five or six hours to the subject between July, 1926, and April, 1927. Let us see if he is not forgetful as to what happened. There is not much dispute about these facts; but, when we consider the reasonable probabilities in the light of these facts, the inference is inescapable that Mr. Singmaster is in error. If he is in error about that, I think he is in error also as to the extent to which he had progressed with this matter prior to leaving the employment of the plaintiff.

The dates must be kept in mind and the nature of the activities that are shown. So

also we must observe the order of the events described.

In July, 1926, Mr. Singmaster had a conversation with Mr. Breyer on the subject of the incorporation of pigments into artificial silk, having in mind particularly at that time zinc oxide. There is no question about it. Both witnesses admit it. In that same month, July, 1926, at Palmerton, there was a microscopic examination of samples of natural and artificial silk by Mr. Green. Somewhat later, but during the summer of 1926, some samples of artificial silk were subjected to ultra-violet ray tests by Mr. Green in the plaintiff's laboratory. Incidentally, I may call your attention to the fact that the evidence shows that Mr. Green is in the employ of or associated with Mr. Singmaster and he was not called; you will note also, when I refer later to Defendants' Exhibit 35, that the significance of the ultra-violet ray tests is that they have a vital bearing upon opacity, as covered in Defendants' Exhibit 35. Mr. Singmaster is a competent chemist. He knew back to that day about the difference between artificial silk and natural silk.

Did the man who only put five or six hours on this whole thing during a period from July of one year to March of the next do anything further? In August or September, 1926, he went down to Mr. Sage's office and there ordered a search in the Patent Office, a search upon the identical question upon which he was concerned or had been concerned—the incorporation of pigments into the filaments of artificial silk. In September, 1926, apparently around about Labor Day, Mr. Singmaster was conferring with an artificial silk manufacturer, Mr. Bosworth, at the Horsehead Inn in Palmerton. That is the date that is fixed by the evidence. Mr. Bosworth, engaged in the manufacture of rayon, was concerned, of course, having knowledge of the manufacture of artificial silk, and, as I understand the evidence, if Mr. Singmaster had not previously known, he then learned about the various processes. He certainly learned at that time about the viscose process and the nitrocellulose process.

Not interested? Had spent only five or six hours on it? Why pursue it? He, a chemist, not in position to understand the composition of viscose and nitrocellulose? It is clear that he did understand it; he understood it at least as early as September, 1926. Moreover, he understood the differences between artificial silk and natural silk before that time.

In November, 1926, he had a discussion with Mr. Trewin about the incorporation of pigments in artificial silk. What inferences are to be drawn from his remark, as to other matters which "we" need interest ourselves in may not be certain; but it is certain that the discussion with Mr. Trewin occurred. It is undisputed. In November, 1926, he received the Arnold search. He also examined some notes in Chemical Abstracts about that time. In November, 1926, Mr. Breyer, with whom he had previously discussed the matter and who was in charge of research of Palmerton, received, according to his own statement, from the Tubize Company, through Mr. Peters, various samples of artificial silk. That is demonstrated by Plaintiff's Exhibit 79; but Mr. Breyer recalls it and so stated on the stand.

As showing that Mr. Singmaster was further interested in November, 1926, he says at that time he examined one of the patents sent him by Mr. Arnold. He refers particularly to a single patent—the Darcey patent. He says that upon examining this patent he learned, as I understand it, that sulphuric acid was present in the performance of the viscose method, and that this would dissolve zinc oxide. That is my understanding of his contention as to or his explanation of why he went no further; why he only put in five or six hours. What happened after that?

In December, 1926, he instructed Mr. Mc-Craven, the librarian at the plaintiff's New York office, to keep a watch for magazine articles dealing with the identical subject. In January, 1927, Mr. McCraven drew to his attention magazine articles (Plaintiff's Exhibits 68 and 69) dealing with the subject. We cannot tell the extent to which they influenced Mr. Singmaster or the extent to which he examined them. They were given to him by Mr. McCraven, and they bear the ordinary indicia, in accordance with the method by which the business of the company was done, that they were submitted to him. Did he abandon the subject then? No.

On March 1, 1927, he directed that Avram's book on Rayon Industry be ordered. He had already informed himself about the different processes for the manufacture of artificial silk in a general way, and he ordered this book on the subject. On March 20, 1927, the book was charged to him. We cannot tell the extent to which he examined it.

In addition there are various scientific papers, produced from the files of the plaintiff's library at Palmerton, containing information on various related problems involved in the identical question, with indicia during the general period, certainly in January, 1927, and later, of having been in the hands of Mr.

Singmaster during his employment by the plaintiff, and bearing the ordinary indications of examination by him.

·What is the natural inference to be drawn from the course of conduct that I have described? It certainly shows a continuous interest by Mr. Singmaster in the subject from July, 1926, to March, 1927. The very order of the events, as I have recited them, is significant; particularly significant in view of his statement that he says he made on or about November 7, 1926, to Mr. Hayes, the vice president of the company, and, as I have pointed out and as you will observe from Defendants' Exhibit 35, from which I will shortly read, certainly as early as the ultra-violet ray examinations by Mr. Green in the summer of 1926 he was in possession of knowledge that was relevant to any scientific man as to opacity.

In the light of all these facts, which I have summarized, the inherent improbability of the patentable idea having come to Mr. Singmaster after he left the employment of the plaintiff is so great that there is no justification whatsoever on the evidence for finding that the invention was made on May 7, rather than preceding May 1, 1927.

■ The explanation made by Mr. Singmaster, as I understand it, of his failure to put more than five or six hours' time upon the matter which he had under consideration preceding May 1, 1927, is that, when he read the Darcey patent and the notes in Chemical Abstracts in November, 1926, they revealed to him something that he had not thought about before. That is the substance of what he says. It revealed to him that, in the important branch of manufacture by the viscose process, there was a bath of sulphuric acid, and that this would destroy or dissolve the zinc oxide which he had contemplated using. And so he was no longer interested in it; the company was no longer interested in it; it could not sell zinc oxide as a result; therefore he was no longer interested in it. Also he says that what was revealed by the Darcey patent was verified by reading at his home Chemical Abstracts, which came under his observation.

Gentlemen, I think Mr. Singmaster is in error about this explanation or his having in November, 1926, ceased to work on the problem; and I will tell you why. It is inherently inconsistent with the type of scientific man that Mr. Singmaster has well shown himself to be; he would never abandon a thing of this significance merely upon reading in the Dar-

cey patent or in Chemical Abstracts that the presence of sulphuric acid in one of the processes would destroy zinc oxide. No, sir; he is too thorough. Moreover, as you will see when I discuss what happened about the strengthening claim, there is unambiguous documentary proof that he did not abandon the subject in 1926. He did not abandon it at all for the reason assigned. He did not abandon the notion that, by the device he had in mind, the filaments of artificial silk could be strengthened, nor did he wait to resume the idea that it would strengthen the filaments until after the Hopewell tests during the week of May 16, 1927, by Mr. Coursen. He explicitly embodied in his memorandum of May 10, 1927, to Mr. Coursen, the claim that it would strengthen. In the present connection, however, it is enough to say that the explanation of the revelation from the Darcey patent and of the Chemical Abstracts is, first, not enough, in the light of the type of chemist, of the talent and qualities possessed by Mr. Singmaster, to sustain abandonment on that ground; and, secondly, abandonment then on that ground is inconsistent with his continuation thereafter to insist that the filaments would be strengthened. The claim that it would strengthen was continued as late even as June 27, 1928, in the Patent Office. The argument presented to the Patent Office by his counsel, Mr. Chambers, after submitting that argument to him for consideration, and after he had carried on the serimeter tests in the laboratory at Bronxville in the winter of 1927 and the spring of 1928, demonstrates that he was still hanging on to the claim. It cannot be, therefore, that what he had said on the stand is the real explanation.

In the light of all these facts, the amount of work and activity on the part of Mr. Singmaster between July, 1926, and the 1st of May, 1927, in conjunction with what he knew, what he did, what he learned, is not it likewise inherently improbable that on this particular day, May 7, 1927, only a week after he left the employment of the plaintiff, at the single interview with Mr. Coursen, he conceived the patentable idea or made the invention? Mr. Coursen revealed to him little, if anything, beyond what he knew before, what we have every reason to infer he must have learned from another silk manufacturer, when he interviewed him at the Horsehead Inn in September, 1926, what was common knowledge and what he could get out of the book which he directed to be obtained and which was handed to him for examination as early as March, 1927. He could have learned about

all these processes with the talent he had as a chemist, with the genius he had, because he did have genius; everybody accords it to him; nobody will deny it to him. I say, is not it inherently improbable that on this particular date May 7, 1927, he made this invention or made this discovery? I think so.

Another document presented by the defendants, Defendants' Exhibit 35, tends to support the conclusions I have stated; tends to negative that discovery was after May 1, 1927. What does it say? I will read a few things in it. This is the so-called amateur patent application, dated May 10, 1927, which was furnished to Mr. Coursen pursuant to his request made, as I recall, when Mr. Singmaster had the interview with him on May 7.

What did Mr. Singmaster say on May 10, 1927? "One pigment I have discovered as particularly suitable for this purpose is zinc oxide, particularly that of fine particle size." Did he make that discovery after May 1? "This pigment can be so dispersed in the plastic material, e. g., into nitrocellulose, as to still permit it to be extruded or spun." Did he learn that after May 1? Certainly the circumstances all indicate he must have known that before. "The addition of pigments of this character, when properly dispersed will result in one or all of the following beneficial effects in making artificial silk or the like;" and the second of those beneficial effects he recites is this: "(2) A reinforcing effect is to be had from the addition of a suitable pigment. Artificial silk may have a strength as low as 60% of that of natural silk, and an increase of strength is highly desirable." Did he learn that after May 1? Certainly not.

Then comes this clause, which, as I conceive it, is of great significance in determining the issue as to dates: "4–a. Since zinc oxide is opaque to ultra-violet light, it should protect silk against harmful chemical effect of the actinic rays of sun light."

Then lastly, in summarizing the advantages in paragraph 8 at the end of the memorandum, he says: "(a) Strength may be increased." "(c) The covering power may be increased."

Gentlemen, all of these things as I see it, all these facts I have recited, these documents I have recited, tend to corroborate the accuracy of the admission made by Mr. Singmaster in his preliminary statement; and that is particularly true in the light of the failure to produce as witnesses in his behalf the various persons whom I have named, who could throw light upon the controverted issue as to dates.

I shall now approach the matter, however, from an entirely different angle, or rather from a more restricted angle. I shall not for the moment take so wide a range of facts for consideration. Eliminating mere statements of conclusions on his part, take what Mr. Singmaster says and see if it does not bring the subject-matter of this litigation, as that subject-matter is described by him, as it existed preceding May 1, 1927, within the terms of the contract, requiring him to transfer it to the plaintiff, investing the property to it in the plaintiff.

Confessedly in 1926 he conceived the idea of incorporating pigments into artificial silk. That there was further progress in the idea after May 1, 1927, is clear. That he learned a great deal on the strengthening problem in the course of time, that he thought of other treatments, and so on, is manifest. Now, it is extremely difficult with precision to draw the line as to how far Mr. Singmaster had progressed at May 1, 1927. As I view the law, it was plainly not essential to reduce the idea to practice in order to bring what had been accomplished up to May 1, 1927, within the contract provision as to patentable ideas. If patentable ideas mean what I have indicated, what I have concluded myself that I am bound to construe the contract to require that I treat as its meaning, then the idea as conceived by Mr. Singmaster in 1926, in the more restricted form that I have described, became the property of the plaintiff. Otherwise, gentlemen, you would have to rewrite the contract. The contract was one freely entered into, deliberately entered into by the parties, and it is the duty of the court to enforce it.

Can it make a difference in the rights of the plaintiff that subsequent to May 1, 1927, that after the employment had ceased, Mr. Singmaster went further, and that the patent as issued embodied much in addition to what he had fully conceived prior to May 1, 1927? I do not think it makes a bit of difference. The analogy to my mind is precisely that which prevails in the doctrine of confusion of goods. There is no way to separate the two —that which was the property of the plaintiff and became the property of the plaintiff prior to May 1, 1927, and that which came about subsequently. The two were commingled. The commingling having been the act by a wrongdoer, the property in the whole mass passed to the one who was innocent. That doctrine is accurately stated in The Idaho, 93 U. S. 575, 23 L. Ed. 978. My

reflection leads me to believe that I am bound, sitting in a court of equity, to apply it here.

If the contract was made, and the terms have the meaning I have ascribed to them, certainly it should be specifically enforced. The meaning, as I can see it, is to be derived from within the four corners of the instrument. There is manifestly an inadequate remedy at law. If the patentable ideas belong to the plaintiff, there is no way by which, in the trial of an action at law, you could measure the damages to the plaintiff by being deprived of that which was its property. In that situation it is the duty of the court, as I conceive it, as established by several decisions of the Circuit Court of Appeals of this circuit, to award specific performance as the remedy.

As I have previously indicated, I see nothing harsh about the contract. I see nothing unreasonable about the contract. The old talk in some of the old decisions, with respect to agreements of this character, completely lost effect when the Supreme Court handed down the Standard Parts Case, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033.

There are four defenses for consideration. I will take these up in order.

First, abandonment or waiver. That is pleaded by both defendants. It constitutes the first and second defenses of Mr. Singmaster.

The reason assigned by him for the alleged abandonment in November, 1926— namely, it having come to his attention that in the viscose process there was employed a sulphuric acid bath, in view of his knowledge as a chemist that subjecting zinc oxide to that bath would dissolve it—appears to me, for reasons I have previously assigned, to be inherently improbable. Mr. Singmaster is a scientific man of too high talent to quit a problem of that kind for such a reason. And that he did not abandon it for that reason is further borne out by the fact that, long after November, 1926, when he says it was abandoned, he persisted in the claim that the employment of pigments, including zinc oxide, as I understand his testimony, would strengthen.

Let us, however, take Mr. Singmaster's own statement of the conversation between himself and Mr. Hayes on or about November 7, 1926, on which wholly or chiefly is predicated the defense of abandonment. Accept the conversation as having occurred precisely as described by Mr. Singmaster. Even so, it would afford no basis whatsoever for finding an abandonment by the plaintiff. According to Mr. Singmaster's account, there was hardly more than a casual remark. There was no revelation of the facts to Mr. Hayes. There was no basis furnished to Mr. Hayes by Mr. Singmaster upon which Mr. Hayes could exercise judgment. According to Mr. Singmaster, after his rather casual statement to Mr. Hayes, the only remark made by Mr. Hayes was, "Well, that is too bad." That comes nowhere in the neighborhood of sustaining the defense of abandonment, as pleaded. There was no declaration by the company that there was a determination then that the matter was not patentable or was not useful or was not practicable. Far from it. What is more, as I have already pointed out, Mr. Singmaster himself did not abandon it then. On the contrary, he pursued it from time to time, as indicated by this record, right straight through at least into the month of March, 1927.

There is another circumstance. Mr. Hayes has testified at considerable length. He is a methodical man. He conducted the business of the plaintiff company in a methodical way, and thoroughly. The provisions of instructions 4–B, in force at the time, prescribed an exact method by which questions as to whether or not work done by employees of the company involved patentable ideas that should be presented to the Patent Office had to go to the patent committee. They did not go to the vice president until after the patent committee had made its report. The patent committee consisted of the general counsel, experts among the personnel of the plaintiff's employees, and experts in the field of patent law. It is practically unthinkable that a man of the type of Mr. Hayes, as disclosed by his testimony and by his appearance on the witness stand, would ever upon a casual remark like that related by Mr. Singmaster undertake, or would even on more complete information have at all undertaken, to discard that piece of property of the company, to throw it away. He would have subjected it to the preordained and prevailing method of determining the question of whether it was or was not without merit before he ever would have exercised any authority in respect to it on behalf of the company.

Abandonment like waiver, I take it, involves conscious relinquishment of a known right. Here, taking Mr. Singmaster's testimony at its face, its full face, there was not sufficient knowledge on the part of Mr. Hayes to enable him consciously to exercise the right. In addition I find that in truth there was no

assent by Mr. Hayes to the company forego- ing whatever right it had to the patentable ideas of Mr. Singmaster.

■■■ The defendants contend also that there was failure on the part of the plaintiff, within a reasonable time, to prosecute an application for a patent, or otherwise to prosecute efforts to procure issuance of the patent in suit. Without full revelation to the plaintiff, without knowledge on its part, of the facts, fault in that regard cannot be attributed to it. The talk with minor employees of the plaintiff mentioned in the testimony was merely casual. It was entirely too vague— whatever the field of their authority and the authority of most of them was very limited— was entirely insufficient to impose on the plaintiff the duty to go forward as between itself and Mr. Singmaster in this regard. Moreover, if I be right on the facts as I have found them and on the law as I conceive it, then in respect to this matter Mr. Singmaster was a wrongdoer, and a wrongdoer cannot take advantage, as between himself and his employer, of his own wrong.

■■■ As I conceive it, all the testimony about Harvey E. Brown's investigations is entirely irrelevant. It has nothing to do with this case. It did not relate to anything that we are concerned with in the controversy, as between Mr. Singmaster and the plaintiff.

Suppose it be true that Mr. Brown went around and made all of the inquiries covered by his memoranda of the Brown Company at Berlin, N. H., and the Little concern at Cambridge, and the Bureau of Standards at Washington, and otherwise, and that as a consequence the plaintiff was entirely willing to let other people go ahead and pursue their activities to their heart's content and get patents of their own, or that the plaintiff was unwilling to pay fees to Mr. Little for carrying on investigations and turning over resulting patents to the plaintiff—all that has nothing to do, that I can see, with the question involved here as to rights, as between the plaintiff and Mr. Singmaster, in another particular piece of property.

Moreover, the explanation of the plaintiff's course of conduct with respect to the Harvey Brown investigations is perfectly natural. What was the plaintiff maintaining the plant, with all the employees and all the equipment, down at Palmerton for, with a provision entitling it to the fruits of the inventive genius of the people it employed, if it was going outside and incurring further expense in regard to identical matters?

I feel bound, therefore, to conclude that there was no abandonment by Mr. Hayes or by anybody else acting for the plaintiff. Indeed, there is nothing whatever presented to sustain the defense of abandonment.

■■■ The second defense, which is set up by the corporate defendant alone, is that it was a bona fide purchaser for value.

Counsel agree, as I understand, and certainly it is the law, that the burden of establishing that defense is on the one who interposes it. Whether it has been established depends on whether or not the corporate defendant was put on inquiry as to the rights of the plaintiff, as between the plaintiff and Mr. Singmaster. Precisely as I have said in regard to the other major question in this case, namely, that an unambiguous admission is shown by the proof, so I say on this branch of the case, there is an unambiguous admission by Mr. Slaughter, the president of the Tubize Silk Company, while engaged in and about the business of that company in that respect.

What does Mr. Slaughter say? What I am about to read to you is in response to a question propounded to him by the defendants' own counsel, raising this identical issue. Here is the record:

"Q. When for the first time did you hear that Mr. Singmaster had ever given any thought to the incorporation of zinc oxide while he was still in the employ of the Zinc Company? A. It was after an interference with the patent that had been filed by the Celanese Company, I think it was.

"Q. By Dreyfus? A. Well, Dreyfus probably. That interference that was connected with that company. Mr. Singmaster had had several conversations with the patent attorneys, and to get an idea of how the matter stood we had a conference in my office. During that conference there was some mention made of a search having been made in 1926, as I remember it, about the incorporation of zinc oxide in silk. That was my first knowledge of that. So I asked Mr. Singmaster just what that was, and he said that he had an idea of incorporating this into silk for the purpose of strengthening it, being based more or less on his experience with rubber."

Then followed an inquiry as to the date of the conversation, and it was brought out that the interference was filed October 22, 1930, and that the talk about which the witness had just testified occurred in November, 1930. As I have previously pointed out, one of the letters which passed between Mr. Chambers and Mr. Singmaster shows that a conference be-

tween the parties, including the counsel, occurred on November 5, 1930.

Was the Tubize Company put on inquiry? At that time less than $30,000 of the purchase price for the patent had been paid. The law is settled for this court by the decision of the Supreme Court of the United States in Smith v. Orton, 131 U. S. lxxv, Appx., 18 L. Ed. 62, that if, in advance of complete payment of all the consideration, knowledge comes to a purchaser which puts him on inquiry, thereupon the defense of bona fide purchase for value without notice is not made out. On the undisputed facts, therefore, as I conceive it, the defense fails.

█ It is argued that Smith v. Orton is a harsh case. Even if harsh, however, it binds me. It is argued also that the decision has been criticised. I have found it cited with apparent approval, however, by the Supreme Court of the United States as late as 236 U. S. I have not followed it down thoroughly, but it has been cited also by the lower federal courts a number of times. So far as I have examined these decisions, I have found no criticism in them. However that may be, what the Supreme Court determines is the law, and I am governed by it.

Furthermore, I do not find by examining the other evidence that the defendants have extricated themselves from the admission made by Mr. Slaughter. On the contrary, I find a great deal to corroborate the admission.

What are the circumstances? Here was the president of the defendant and here were the lawyers for the defendant and here was Mr. Singmaster. They were engaged in and about the identical thing now under inquiry. They all had under consideration the preparation of the preliminary statement, in answer to this interference proceeding. The inference is inescapable that the lawyers were fully informed. I am inclined to think that the defendant corporation is bound by what the lawyers knew at that time. However that may be, we need not go so far, because Mr. Slaughter was there and participated with them, and, according to his own account, he was put on inquiry by explicit notice given to him by Mr. Singmaster. I think also that the notice was explicit or that he must at least have been put on inquiry by the preliminary statement itself. He must have had knowledge of the recitals in that paper before it was filed.

There is another phase of this branch of this case; that is what occurred between Mr. Coursen and Mr. Peters, on the one hand, and Mr. Singmaster, on the other.

There is no question but that Mr. Coursen and Mr. Peters knew that Mr. Singmaster had been in the employ of that plaintiff. There is no question but that they knew that, only a few days previous to their talk with him, he had left the employment of the plaintiff. There is no question but that they knew of his talents, both as a chemist and as an inventor. There is no question but that they knew the relations between the plaintiff and its employees with respect to the rights of the plaintiff, as between itself and its employees, to have transferred to it the fruits of the inventive genius of the employees as defined by the instructions. Mr. Peters had left the employment of the plaintiff in July, 1926. Mr. Coursen had left the employment of the plaintiff as early as 1921, preceding the adoption of instructions 4–B; but the provisions of 4–B, in the sole respects material here, were substantially the same in their essential features as had prevailed in the company from 1912 down to 1921. Mr. Coursen and Mr. Peters knew that zinc oxide was the product, or one of the products, of the plaintiff. The very discussion included the suggestion of the use of zinc oxide as a pigment, or one of the pigments, for incorporation into the filaments. In addition to that, the testimony of both Mr. Peters and Mr. Coursen with respect to their consideration as between themselves of this very matter at that time, one being then the president and the other the vice president of the Tubize Company, brought before them, and their minds were alert to, the question of whether anybody else had a conflicting interest with the thing that was being proposed to them by Mr. Singmaster. They themselves both say that they considered whether or not there was any conflict with what Mr. Gardiner was doing. They concluded not. Did it come into their minds then as to whether there was any conflict between the thing that was being proposed to them by Mr. Singmaster and the plaintiff—by Mr. Singmaster, an inventor, who had just left the employment of the plaintiff, dealing with a subject-matter produced by the plaintiff? Why not?

I have examined to some extent the decisions on the subject of whether what they say and the reasonable inferences from it were enough to put on inquiry the corporation of which they were officers. I have not had opportunity since the adjournment on Friday to run them down thoroughly. It is

rather difficult with certainty and precision properly to apply the rule as to what is required in the way of presence in the mind of an agent of information that he has gathered while in the service on a previous date of another principal. As indicated by the Distilled Spirits Case, 11 Wall. 356, 20 L. Ed. 167, the question is one about which there had been a good deal of conflict. Apparently the rule as to the necessity of presence in the mind of an agent, under those circumstances, is established by the Supreme Court, as contended for by Mr. Kitchel, and there is a good general statement on the point in Hoover v. Wise, 91 U. S. 308, 23 L. Ed. 392.

What was actually passed on in Gardiner v. Equitable Office Bldg. Corp., 273 F. 441, 17 A. L. R. 431, by the Circuit Court of Appeals for this circuit, cited by the defendants, does not seem to me to determine the matter. It relates to two directors. It contains some broad expressions which literally may apply; but one of the persons concerned was not a director when he obtained his information, and the other was acting exclusively for himself and not for the corporation at the time the information came to him.

In my limited search of the authorities since Friday I have not had sufficient opportunity thoroughly to convince myself that the agency rule invoked is, without qualification, fully applicable in the branch of corporation law which deals with those who act on behalf of a corporation as its alter ego, such as in this instance the president and vice president. I will not state to you yet my final impressions, or even my present impressions, either on the law or on the facts of this branch of the case, because I feel so strongly on the other branch that the defense of bona fide purchaser for value is not made out, that I prefer, and I think it in the interest of fairness, to postpone the ultimate resolution of this agency question until the coming in of the accounting.

As I conceive it, if anything be involved as between this particular agency phase and the phase growing out of the testimony of Mr. Slaughter, it is only a matter of amount of profits. I am not sure from my consideration of the matter, with the information presently available, as to whether or not a decision of the point would make any practical difference. So the question may be reserved for further consideration in connection with the accounting. The decree may provide in this regard that separate statements of the profits and damages be made as of, or having a bearing upon the issue as of, the date of May 7, 1927,

and as of the date of November 5, 1930. The latter seems to me to be the exact date of the coming to the knowledge of Mr. Slaughter of the information, based on his own admission, which I have already commented upon. At any rate, it is near enough for all present purposes.

Next, it is contended that notice went to the defendant company through a telephone conversation of Mr. Singmaster with Mr. Peters in September, 1926. The testimony as to that telephone conversation is conflicting. On the one hand, Mr. McCraven says he overheard it. On the other hand, it is denied by Mr. Singmaster and by Mr. Peters. There are two or three things that I want to say in regard to the matter, although, just as in connection with the dealings between Mr. Singmaster and Messrs. Coursen and Peters on May 7, 1927, I shall leave the issue undetermined, because I see no occasion now to determine the conflict in the testimony mentioned.

First, I want to point out that, if the court be under obligation to apply to the resolution of the conflict the rule as announced in Stitt v. Huidekoper, 17 Wall. 384, 21 L. Ed. 644, cited and relied on by the defendants, I should be compelled to sustain Mr. McCraven, because he testified to something positive, whereas the testimony of Mr. Singmaster and Mr. Peters about the matter was merely negative. However, that rule, growing out of approval by Mr. Justice Miller of the correctness of an instruction given to a jury by the trial court as to what are the available methods by which they may consider evidence, is only one of many rules. It is not the only rule. There are many other rules. The problem of every trier of facts is to ascertain, as nearly as he can, what is the truth from all the facts and circumstances; the court is not held down by any single rule.

The next thing I want to say is that there is no occasion for adverse comment on or criticism of any of these witnesses. I am fully impressed that Mr. McCraven is honest. If I should find contrary to his testimony in this regard, it would be merely on the ground that I thought he was mistaken. I also find no occasion to criticise either Mr. Singmaster or Mr. Peters. Happily, at least happily for me, in my view it is wholly unnecessary to pass on the issue as to who is correct in his recollection about the telephone conversation.

I have already indicated, and I think I ought to repeat by way of emphasis, that I have no harsh comment to make on Mr. Sing-

master. My conclusions of fact which are adverse to his testimony are not at all based on any notion that he consciously misstated things. He is temperamental. He has a large interest at stake in the case. He is biased. We are concerned with questions of fact, and we are in a field where it is extremely difficult, dealing, as we must here, with conditions of the mind, to get at the truth.

■ As to laches, it is initially to be observed that the plaintiff has offered no explanation of why it postponed from August, 1929, when it learned of the existence of the patent, until April, 1931, to bring the suit as against Singmaster. On the other hand, so also the defendant corporation has failed to offer any explanation of its withholding of the assignment of the patent from the record in the Patent Office. I think it is about 50-50 on that phase of explanations. Nevertheless, neither is determinative of any issue with respect to laches.

■ The plaintiff did not owe Mr. Singmaster any duty of expeditious conduct, if the fact be, as I have found it to be, that he took some of the plaintiff's property. Nothing but the statute of limitations could properly prevent the plaintiff from pursuing him in a suit either at law or in equity, as it might deem appropriate in invoking the aid of the law.

■ The corporate defendant does not plead laches, as I read its answer, unless it can be regarded as incorporated in the defense of bona fide purchaser for value. However, treating the corporation as having invoked that defense as it was argued here orally, I see no basis for sustaining it. The plaintiff had no knowledge until March, 1931, of any interest in the patent, or even any assertion of interest in or ownership of the patent, on the part of the defendant corporation until March, 1931. The suit was promptly brought in April, 1931, the next month. Moreover, as I have already said, as early as November, 1930, the defendant corporation was adequately put on inquiry as to the rights of the plaintiff, and its action thereafter without having made inquiry was at its own risk, and hence it must take the penalty of its failure to make the inquiry.

■ As I have already said, it is not shown that the plaintiff had any knowledge whatsoever of the assignment or transfer of the patent to the defendant earlier than March, 1931. The testimony as to talk during the period earlier than November, 1930, between those connected with Singmaster and Breyer on the one hand and employees connected with the plaintiff's research establishment at Palmerton, was in its nature merely casual. It was entirely too casual, and is wholly insufficient, to prove or to afford a basis for finding that the plaintiff was thereby put on notice of or even on inquiry as to the ownership or claim of ownership by the defendant corporation of the patent.

■ Lastly, the defense of estoppel has been discussed, although I fail to find it pleaded.

The principle is clear that, if in my presence you are undertaking to make a sale of my property and I stand silent and do not protest, I am estopped from making complaint against the purchaser of the title he acquires to the property. That, however, has no application here. The parties to the sale of the patent did not make the transfer or attempt to make it prior to or immediately after the granting of the patent. The contract of transfer between Mr. Singmaster and the purchaser from him was not entered into until March, 1930. The predecessor of the defendant corporation guided the patent application through the Patent Office. Yet it has never lodged there any disclosure of its claim of title to the patent. The plaintiff learned of the claim only through a newspaper announcement of an infringement suit instituted by the defendant corporation. It failed to bring home to the plaintiff any notice earlier than March, 1931, of the transfer of the patent to it or of any claim of interest on its part to the patent.

The defense of estoppel therefore is not made out.

■ Something has been said about the interest of the defendant corporation's stockholders. They have no standing in this suit. This is a litigation between the plaintiff and defendant corporations. In this litigation, under the merger arrangement as well as by force of the law, the Tubize and the Chatillon corporations stand on the same basis.

■ Something has been said about variances between the proof and the allegations of the bill of complaint. To the extent that there are any, they are trifling, and nobody has been misled or injured by them. I have rarely tried a case where there were such full bills of particulars as in this case. Nobody has been surprised. Moreover, there is nothing substantial about the alleged variances. An excellent illustration, perhaps the strongest illustration, is that in paragraph 7 of the bill, in identifying the invention, the quality of strengthening is included in the words of

description. Whether the language of the patent itself would warrant employment of this language may or may not be so; but there is nothing misleading about it, and the criticism may be entirely disregarded.

Accordingly, I conclude as follows: I find for the plaintiff and adverse to the defendants on all issues made by the pleadings with respect to this branch of the case—on the issues of fact as well as on the issues of law. The result is that a decree will follow for the plaintiff in regard to this particular patent.

The decree as to patent No. 1,725,742 will be in accordance with the prayer of the bill, requiring an assignment of the patent to the plaintiff, awarding an injunction, and providing for an accounting. In the accounting the master should include an ascertainment of the facts with respect to profits or other elements of money recovery as of the two dates I have previously indicated, May 7, 1927, and November 5, 1930, so that upon the coming in of the report I may determine the reserved question as to the time when the defendant corporation was put on inquiry if necessary.

There are three other patents included in the pleadings—two British and the so-called supplemental American patent, covered by the supplemental bill. As I conceive it, the rights of the parties in regard to those patents involve different, or the consideration of different or additional, questions of law. I should like to hear those questions of law further argued before making up my mind as to what my duty is in regard to their determination. There has been so much to argue in this case on issues of fact and on other issues of law that I feel that the issues of law as they affect the two British patents and the supplemental American patent have not been fully explored.

Apparently also the issues of law in respect to those three patents may be identical with, or may vitally affect, the issues of law that would arise under the stipulation in regard to the other patents and applications to be brought into the litigation. Personally I would prefer to determine all of those questions together, rather than at present to determine the issues as to the British patents and the supplemental American patent.

Each side may take one week to decide whether or not they wish to bring on for further argument before me the issues of law as to the two British patents and the one supplemental patent. They should give notice to each other. If either thereupon wants further to argue those issues, in advance of my taking up under the amendment to the bill the additional patents and applications not already brought into the litigation, they may appear at my chambers on April 4, at 4:30 p. m. Unless some good reason to the contrary is shown, I will then set a date for hearing further argument; or, if you wish to extend that date by stipulation, you may do so and give me notice accordingly.

### Supplemental Opinion.

■ Upon the face of the documents themselves it seems plain that the second American patent (No. 1,875,894) and the two British patents (Nos. 339,603 and 342,743) each embody or are dependent on or are supplementary to or are developments out of the invention covered by the first American patent (No. 1,725,742). In other words, in the language of the patent statute (35 USCA § 31) as well as of the court decisions, the additional patents are "improvements" of the original invention which my decision of March 27 awarded to the plaintiff as property which accrued to it by force of instructions 4–B. This is true irrespective of whether the additional patents include inventive elements which had not occurred to Mr. Singmaster previous to his leaving the plaintiff's employ and have incorporated in them separately patentable later novel conceptions.

If what has been stated be accepted as a basis, then it seems to me also to follow that there is inextricably intermingled in all the subsequent patents an invention which belongs to the plaintiff. Upon the analogy of the doctrine of confusion of goods, I think, therefore, that these subsequent patents also must, by virtue of the contract between the plaintiff and Mr. Singmaster, go to the plaintiff.

■ Moreover, ownership of the first American patent carries with it all rights thereto or thereunder arising out of the patent law. Among these is the right on the part of the plaintiff to prevent use of the improvement patents without its consent. Temco Electric Motor Co. v. Apco Mfg. Co., 275 U. S. 319, 328, 48 S. Ct. 170, 72 L. Ed. 298. The result is that, at the minimum, the plaintiff, if threatened by defendants' use of the improvement patents, would be entitled to an injunction. I feel that this well-settled doctrine of the patent law strongly sustains the conclusion I have reached by application of the confusion of goods analogy.

I take it that ultimately some line of demarcation in the field dealt with may have to be fixed. It seems unthinkable that there can

be a permanent mortgage to an employer on the mental fruits of a former employee. Nevertheless, there does not appear to me to be occasion for drawing the line now, for the reason that the instance with which we are concerned falls clearly within the employer's domain. It may be put by saying that here title to the parent carries title to the progeny.

The defendants have construed my prior comments on the admission contained in Mr. Singmaster's answer in the Dreyfus interference proceeding as designed merely to find that there was a concession that what was embraced in the product claims of the first American patent came into being prior to May 1, 1927. It was not my intention so to limit the finding. I referred to the substantial identity of the counts in the declaration of interference with the fourth and fifth claims of the first patent for the purpose of demonstrating that Mr. Singmaster must have been dealing consciously with the invention in controversy. I thought then, however—I think now and I think the proof would not justify any other finding than—that Mr. Singmaster said unreservedly that the invention in its entirety in the sense of a patentable idea, which had led the Patent Office to grant his application for a patent thereon, came about while he was still in the employment of the plaintiff. What that invention consisted of is to be ascertained from an examination of all the claims as well as all the specifications. Cf. McClain v. Ortmayer, 141 U. S. 419, 12 S. Ct. 76, 35 L. Ed. 800.

Again, the defendants say that Mr. Singmaster did not conceive of or realize the delustering effect of the invention until May 7, 1927, after he had left the plaintiff. Let this be conceded, although it is to be noted that, coupled with my finding as to the first American patent, the assumption seems to be at variance with the description of that patent as set out in the second American patent, as well as with a good deal of evidence. If, however, conception of delustering did not precede May 1, 1927, the addition of a claim to that accomplishment was at best but of an improvement of the first American patent, and does not alter or weaken the fundamental ground upon which the later patents pass to the plaintiff.

It is urged further by the defendants that, as illustrated in Plaintiff's Exhibit 39, the plaintiff through certain of its officials conceded to Mr. Gaskill the right, under the ownership clause of the instructions, to an improvement, made by him after he left the service of the plaintiff, of what was his patentable idea during that service. There are, as I see it, two adequate replies: (1) That inconsistency, if shown, does not affect the rights, inter sese, of another employee than Mr. Gaskill and the plaintiff; (2) that the facts were insufficiently developed at the trial to establish that there may not have been differentiating circumstances which rob the case of weight as a precedent here.

A good deal has been said in oral argument and in the briefs about a considerable volume of testimony relating to titanium dioxide and the particular materials or means disclosed by the British patents. In short, I may say that I think the proof shows that the improvements for which the British patents were granted ensued from researches conducted by Mr. Singmaster after he left the plaintiff, though I am at least dubious as to whether that is so as to the improvement for which the second American patent was granted. If I be right, however, in believing that what is set out in the papers, standing alone, as they issued from the patent offices, is ample support for the plaintiff's claim, then there is no need for going into the details of the testimony. A comprehensive discussion of that aspect of the matter would require much time and cause substantial delay. I refrain from it, partly because both sides have requested an early disposition, so as to facilitate an appeal.

As I have indicated to counsel, I have entertained serious doubts upon the rather novel question presented. In so far as revealed by my own researches, the issue is one of first impression. Despite those doubts, it seems to me that, on settled principles, the great weight of convincing argument upholds the view I have adopted.

If counsel desire to speed a hearing in the appellate court with the hope of its being reached there before summer, I shall be glad to co-operate with them in settling the decree promptly.

My conclusion is that the plaintiff should have the same relief in regard to the second American and the two British patents as has already been determined in its favor with respect to the first American patent.